# UNITED STATES COURT OF APPEALS
# FOR THE DISTRICT OF COLUMBIA CIRCUIT

| | |
|---|---|
| STARBUCKS CORPORATION d/b/a Starbucks Coffee Company<br><br>Petitioner,<br><br>v.<br><br>NATIONAL LABOR RELATIONS BOARD,<br><br>Respondent. | Case No. 23-1171 |

## PETITION FOR REVIEW

Petitioner Starbucks Corporation d/b/a Starbucks Coffee Company ("Starbucks") hereby petitions the Court to review and modify or set aside the Decision and Order of the National Labor Relations Board issued against Starbucks on June 20, 2023 in NLRB Case Nos. 19-CA-289275 and 19-CA-289771. A copy of the Decision and Order reported at 372 NLRB No. 93 (June 20, 2023) is attached, along with a Corporate Disclosure Statement.

Respectfully,

*/s/ Maurice Baskin*
Maurice Baskin
Littler Mendelson, P.C.
815 Connecticut Ave., NW, Suite 400
Washington, D.C.
202-842-3400
mbaskin@littler.com

*Attorney for Petitioner*

# CERTIFICATE OF SERVICE

I hereby certify that all parties admitted to participate in the agency proceedings below are being served with the Petition for Review, Corporate Disclosure Statement, and attached Decision, in the manner specified below, this 30th day of June 2023:

**By overnight mail and email:**
Ruth E. Burdick, Deputy Associate General Counsel
    for Appellate and Supreme Court Litigation
Jennifer A. Abruzzo, General Counsel
Roxanne L. Rothschild, Executive Secretary
1015 Half St., S.E.
Washington, DC 20570-0001
appellatecourt@nlrb.gov

**By regular mail:**
Alice Garfield
Sarah McBride
Counsel for the General Counsel
National Labor Relations Board
2948 Jackson Federal Building
915 Second Ave
Seattle, WA 98174
Alice.garfield@nlrb.gov
Sarah.McBride@nlrb.gov

Dmitri Iglitzin, Attorney
Marina Multhaup, Attorney
Ben Berger, Attorney
Barnard, Iglitzin & Lavitt LLP
18 W Mercer St., Ste. 400
Seattle, WA 98119-3971
iglitzin@workerlaw.com
multhaup@workerlaw.com

berger@workerlaw.com

Ian Hayes, Attorney
Hayes Dolce
471 Voorhees Ave.
Buffalo, NY 14216
ihayes@hayesdolce.com

*/s/ Maurice Baskin*

# UNITED STATES COURT OF APPEALS
# FOR THE DISTRICT OF COLUMBIA CIRCUIT

| | |
|---|---|
| **STARBUCKS CORPORATION** d/b/a Starbucks Coffee Company<br><br>Petitioner,<br><br>v.<br><br>**NATIONAL LABOR RELATIONS BOARD**,<br><br>Respondent. | CASE NO. _____ |

## RULE 26.1 CORPORATE DISCLOSURE STATEMENT

Petitioner Starbucks Corporation ("Starbucks") is a Washington state corporation that operates over 9,000 retail locations across the United States. Starbucks has no parent corporation, no publicly held corporation owns more than 10% of Starbucks' stock, and no publicly held company has a 10% or greater ownership interest in Starbucks.

Dated: June 30, 2023                    Respectfully,

                                        */s/ Maurice Baskin*
                                        Maurice Baskin
                                        Littler Mendelson, P.C.
                                        815 Connecticut Ave., NW, Suite 400
                                        Washington, D.C.
                                        202-842-3400
                                        mbaskin@littler.com

                                        *Attorney for Petitioner*

*NOTICE: This opinion is subject to formal revision before publication in the bound volumes of NLRB decisions. Readers are requested to notify the Executive Secretary, National Labor Relations Board, Washington, D.C. 20570, of any typographical or other formal errors so that corrections can be included in the bound volumes.*

**Starbucks Corporation *and* Workers United affiliated with Service Employees International Union.** Cases 19–CA–289275 and 19–CA–289771

June 20, 2023

DECISION AND ORDER

BY CHAIRMAN MCFERRAN AND MEMBERS KAPLAN AND WILCOX

On November 3, 2022, Administrative Law Judge John T. Giannopoulos issued the attached decision.[1] The Respondent filed exceptions and a supporting brief, and the General Counsel and the Charging Party each filed an answering brief.[2]

The National Labor Relations Board has delegated its authority in this proceeding to a three-member panel.

The Board has considered the decision and the record in light of the exceptions and briefs and has decided to affirm the judge's rulings, findings,[3] and conclusions[4] and to adopt the recommended Order.

ORDER

The National Labor Relations Board adopts the recommended Order of the administrative law judge and orders that the Respondent, Starbucks Corporation, Seattle, Washington, its officers, agents, successors, and assigns, shall take the action set forth in the Order.

Dated, Washington, D.C. June 20, 2023

_____
Lauren McFerran,                Chairman

_____
Marvin E. Kaplan,               Member

_____
Gwynne A. Wilcox,               Member

(SEAL)   NATIONAL LABOR RELATIONS BOARD

---

[1] During the hearing, a witness testified to using they/them pronouns as their personal pronouns. The judge's decision referred to this witness using a different set of personal pronouns. It is the Board's practice to refer to individuals by the personal pronouns that they indicate they use. We have therefore corrected this in the judge's decision.

[2] The General Counsel's answering brief requests that the Board "admonish or otherwise sanction" the Respondent and its counsel for attorney misconduct. Under Sec. 102.177(b) of the Board's Rules and Regulations, the Board "has the authority in the proceeding in which the misconduct occurred to admonish or reprimand, after due notice, any person who engages in misconduct at a hearing," notwithstanding the separate disciplinary procedure established under Sec. 102.177(e). Other sanctions, however, require that an allegation of attorney misconduct be filed with the Division of Operations-Management, which will investigate and decide whether to institute disciplinary proceedings. See *McAllister Towing & Transportation Co.*, 341 NLRB 394, 398 fn. 7 (2004), enfd. 156 F. App'x 386 (2d Cir. 2005). We decline to admonish the Respondent or its counsel, or to refer this matter to the Division of Operations-Management sua sponte.

[3] The Respondent has excepted to some of the judge's credibility findings. The Board's established policy is not to overrule an administrative law judge's credibility resolutions unless the clear preponderance of all the relevant evidence convinces us that they are incorrect. *Standard Dry Wall Products*, 91 NLRB 544 (1950), enfd. 188 F.2d 362 (3d Cir. 1951). We have carefully examined the record and find no basis for reversing the findings.

[4] Employee Rachel Ybarra distributed union buttons in public areas on two separate instances: in the first instance, while working, Ybarra gave buttons to a customer who had solicited them; in the second instance, Ybarra gave a bag of buttons to a Starbucks employee while they were taking their paid break in a customer area. Having observed both distributions, Store Manager Pam Mariscal spoke with Ybarra and said that they were not allowed to distribute while on the clock but were welcome to do so outside of company property during their time off. In response, Ybarra pointed out that the second distribution occurred during their 10-minute break. Mariscal replied by telling Ybarra, "that is still considered a company paid-time, so it is not something you should be doing while on the clock." The judge concluded that Mariscal's statements, taken together, violated Sec. 8(a)(1) by prohibiting all union distribution during paid break periods. In adopting this finding, we emphasize that an employee would have reasonably understood the prohibition to improperly extend beyond the selling floor to the entire store, including nonpublic areas, like the backroom. See, e.g., *Sam's Club*, 349 NLRB 1007, 1009 fn. 11 (2007).

Unlike his colleagues, Member Kaplan would not find that Mariscal's initial statement violated the Act. Member Kaplan does not believe that a reasonable employee would interpret Mariscal's statement, in the context of Ybarra's distribution having occurred in a customer area, as establishing that employees who are off duty could not distribute buttons in nonwork areas. Member Kaplan also notes that Mariscal correctly informed Ybarra that they were welcome to engage in union distribution outside of the store during nonwork hours. Member Kaplan does, however, agree with his colleagues that Mariscal's later statement reiterating that Ybarra's paid break period was "company time" and that they were "on the clock" violated the Act. Member Kaplan believes that this statement—in context—would be reasonably understood as a general prohibition against engaging in protected concerted activity during paid break time, therefore infringing on Ybarra's Sec. 7 rights.

In addition, we agree with the judge for the reasons he states that the Respondent violated Sec. 8(a)(1) by telling Ybarra that they must secure coverage for their shift before testifying pursuant to a Board subpoena and by threatening to discipline Ybarra if they testified prior to securing coverage for their shift. Member Kaplan notes that the Respondent presented no evidence to contradict Ybarra's credited testimony that established these violations.

*Alice J. Garfield, Esq.* and *Sarah M. McBride, Esq.* for the General Counsel.

*Marina Multhaup, Esq. (Barnard Iglitzin & Lavitt, LLP)*, for the Charging Party.

*Renea I. Saade, Esq. Breanne Lynch, Esq. (Littler Mendelson PC)* for the Respondent.

### DECISION

#### STATEMENT OF THE CASE

JOHN T. GIANNOPOULOS, Administrative Law Judge. This case was tried before me on September 13 and 14, 2022, in Seattle, Washington.[1] After charges were filed by Workers United, affiliated with the Service Employees International Union (Union), on August 10, an Order Consolidating Cases, Consolidated Complaint and Notice of Hearing (Complaint) issued alleging that Starbucks Corporation (Starbucks or Respondent) violated Section 8(a)(1) of the National Labor Relations Act (the Act). The unfair labor practice allegations are premised upon statements made by two different Starbucks store managers during an organizing drive that was occurring at one specific store in Seattle, Washington. Respondent denies the unfair labor practice allegations.

Based upon the entire record, including my observation of witness demeanor, and after considering the briefs filed by the General Counsel, the Union, and Respondent, I make the following findings of fact and conclusions of law.[2]

#### I. JURISDICTION AND LABOR ORGANIZATION

Starbucks is a Washington corporation with a principal place of business in Seattle, Washington. *Roh v. Starbucks Corp.*, 881 F.3d 969, 972 (7th Cir. 2018). The company is a "prominent global purveyor of specialty coffee and coffee products" with thousands of retail locations worldwide. *Starbucks Corp. v. Wolfe's Borough Coffee, Inc.*, 736 F.3d 198, 201 (2d Cir. 2013). In conducting its business operations, Respondent derives annual gross revenues in excess of $500,000 and it purchases and receives goods for use within the State of Washington from points directly outside the state that are valued in excess of $50,000. Respondent admits, and I find, that it is an employer engaged in commerce within the meaning of Sections 2(2), (6), and (7) of the Act. Respondent also admits, and I find, that the Union is a labor organization within the meaning of Section 2(5) of the Act. Accordingly, I find that this dispute affects commerce and the National Labor Relations Board (NLRB or the Board) has jurisdiction pursuant to Section 10(a) of the Act.

#### II. FACTS

#### A. General Background

Respondent operates a retail store in Seattle, Washington located at 101 Broadway East, in the Capitol Hill neighborhood of the city. This store, known as Store #304, is situated at the corner of the intersection of East Denny Way and Broadway. Pam Mariscal (Mariscal) is the store manager at Store #304. At the time of the hearing, she had worked as the manager of this store for just under three years.[3] (Tr. 60–61, 187, 240, 282)

On December 20, 2021, the Union filed a petition to represent the employees working at Store #304. The next day, the Regional Director for NLRB Region 19 scheduled a video conference hearing to be held on the Union's petition starting on Wednesday, January 12. The hearing lasted four days.[4] Because Starbucks contested the appropriateness of the single-store unit sought by the Union, the company bore the burden of proof at the hearing to show that a unit limited to Store #304 employees was not appropriate. *Hilander Foods*, 348 NLRB 1200, 1200 (2006) (a single-facility unit is presumptively relevant and the burden of rebutting this presumption falls on the party arguing in favor of a multi-facility unit). Starbucks called four witnesses at the representation hearing including Mariscal, who testified on January 12 and January 13.[5] The company rested its case at the end of the day on Friday, January 14. Because of the Martin Luther King Jr. Day holiday, the hearing did not resume again until 9:00 a.m. on Tuesday, January 18. When the hearing resumed, the Union called two witnesses in support of its position; one of those witnesses was Rachel Ybarra (Ybarra), a barista who worked at Store #304. Ybarra started working for Starbucks in April 2020, spending their first 6 months at various stores in the Seattle area, before settling at Store #304. (Tr. 122–123; R. 3; ALJ. 4–5)

During the representation proceeding, Store #304 was described as a "lobby store," meaning that it has limited lobby area seating, as opposed to a "café lobby" store, which has a large lobby and specific café seating.[6] Whatever customer seating that existed in Store #304 was actually removed from the store in the Fall of 2021 because of safety concerns.[7] Starbucks considered the lack of customer seating to be temporary, but as of the date of the representation hearing the company did not have any current plans to restore the customer seating in Store #304.[8] Ryan Lawrence (Lawrence), a Starbucks manager, testified that Store

---

[1] All dates are in 2022 unless otherwise noted.

[2] Testimony contrary to my findings has been specifically considered and discredited. Unless otherwise noted, witness demeanor was considered in making all credibility resolutions.

[3] Transcript citations are denoted by "Tr." with the appropriate page number. Citations to the General Counsel, Respondent, and Administrative Law Judge exhibits are denoted by "GC," "R," and "ALJ" respectively. Transcript and exhibit citations are intended as an aid only. Factual findings are based upon the entire record and may include parts of the record that are not specifically cited.

[4] I take judicial notice of the record, including the transcripts, in the underlying representation proceeding in Case 19–RC–287954 (R-Case Transcript). *Kansas City Terminal Elevator Co.*, 260 NLRB 611, fn. 1 (1982), enfd. 697 F.2d 269, 270 (8th Cir. 1983) (Board takes official notice of the record in the underlying representation proceeding); *Spring Valley Farms, Inc.*, 274 NLRB 643, 643 (1985) (administrative law judge takes judicial notice of the decision and the transcript in the prior representation proceeding).

[5] During her testimony in this matter, Mariscal said that she provided testimony at the representation proceeding on Thursday, January 13 and Friday, January 14. (Tr. 284, 295) However, the transcript in Case 19-RC-287954 shows that she actually testified on January 12 and January 13; she did not testify on January 14. See R-Case Transcript, at 3, 26, 198, 201, 257, 385.

[6] R-Case Transcript, at 120, 556.

[7] R-Case Transcript, at 366–367, 430–431.

[8] R-Case Transcript, at 431, 441–444.

#304 is "a café where customers would come in, get their beverage, and leave." (Tr. 188)

The layout of Store #304 resembles a large rectangle. Customers enter from one corner of the store into an "L" shaped lobby. The store has a long counter/bar, with patrons standing on one side of the counter and employees working "the line" on the other side. The area closest to the lobby is the hand-off station, where employees hand drinks off to customers. Next to the hand-off station is the area where baristas make drinks, known as the bar. Adjacent to the bar are the cash registers where customers place their orders. Directly behind the counter, in the employee work area and along the wall, are ovens, which are used to reheat items, and a set of refrigerators. The employee work area behind the counter is about six feet long. Between the back wall and the counter is a "little bit" of walking space where the employees work. (Tr. 273). At the far corner of the employee work area, along the back wall and around the corner, is a set of double swinging doors that lead to the back room. The back room is a shared space used by both employees and management. It contains additional refrigerators, freezers, a dishwashing area, various electronic equipment, and a desk for the store manager. Employees have lockers in the back room to store their personal belongings and the area contains a small table with a few chairs; employees place their personal items on the table and use the chairs to sit down during breaks. The back room also contains an employee bathroom. (Tr. 76, 132–133, 147, 170, 242, 271–275, 324)

An election was ultimately held for the Store #304 employees and the tally of ballots issued on March 22. Out of approximately thirteen eligible voters, ten employees voted. Nine voted to be represented by the Union, no employee voted against union representation, and one ballot was challenged.[9] On March 30, the Union was certified as the collective-bargaining representative of the baristas and shift supervisors employed at Store #304. (ALJ. 6)

### B. Complaint paragraphs 4(a) and 4(b)

Complaint paragraphs 4(a) and 4(b) allege that on or about January 14, Respondent: (1) threatened employees with discipline if they attended an NLRB hearing pursuant to a subpoena without first securing coverage for their shift; and (2) and informed employees that a subpoena does not excuse them from work. These allegations involve statements made to Ybarra regarding their subpoena to testify at the NLRB representation proceeding in January 2022.

#### 1. Ybarra's subpoena

When Mariscal testified by videoconference at the representation hearing on January 12 and 13, she did so from a location known as the Starbucks Seattle support center; she was not at Store #304. While Mariscal was occupied with the representation hearing, another store manager named Halley Hagar (Hagar) covered Mariscal's management shifts at Store #304. Hagar was the manager presence at the store in Mariscal's absence and served as Mariscal's point of contact for the store over the weekend. Hagar was a manager at a nearby store known as Olive Way.[10] It is unclear how long Hagar had been a store manager, but one Starbucks official testified that Hagar was the person he would think of as the manager of the Olive Way store. (Tr. 65, 110, 221–222, 252–253, 284–285, 293)

The Union subpoenaed Ybarra to testify on its behalf at the representation hearing. Ybarra's subpoena is dated December 22, 2021, and calls for them to appear on January 13, at 9:00 a.m., or on any adjourned or rescheduled day, to testify. Notwithstanding the subpoena's date, Ybarra did not receive the subpoena from the Union until January 10; they received it by email. Because Starbucks did not rest its case until late in the day on Friday, January 14, the Union did not call any of its witnesses in the representation hearing, including Ybarra, until January 18. Ybarra was the Union's second and final witness.[11] (Tr. 62–63, 134, 180–181; GC. 4, 6)

On January 14, Ybarra was working the morning shift at Store #304, and Hagar was still covering for Mariscal as the store manager. Ybarra had a conversation with Hagar that day about the NLRB subpoena they had received. The conversation occurred behind the counter in the work area, while they were standing near the ovens. Ybarra said that a coworker named Justin was also present. (Tr. 65–66, 95, 110, 132–133; R. 2)

According to Ybarra, they had forgotten that Monday, January 17 was a public holiday and believed they needed to take the day off to testify at the representation hearing. Ybarra discussed the matter with Justin, and they agreed it would be best to speak with Hagar for clarification. Ybarra said that they approached Hagar to let her know that they had received a subpoena and would be testifying at the NLRB hearing on a day they were scheduled to work, likely January 17. Ybarra asked Hagar what they needed to do to make sure it was okay for them to be off work that day in order to attend the hearing pursuant to the subpoena. In response, Ybarra testified Hagar told them that, according to Starbucks policy, a subpoena is not a protected reason to miss work and Ybarra needed to find someone to fill in for their shift in order to avoid being disciplined. Ybarra said that they acknowledged what Hagar had told them about needing to find coverage, and the conversation ended. Ybarra understood Hagar's response to mean that, if she attended the hearing without finding coverage for her shift, they would be disciplined. (Tr. 67–68, 94–95, 134–136, 141–142)

After the conversation, Ybarra wrote a note to themself about what occurred using a note app on their phone. The note reads as follows:

> 1/14–9:45 am I told a support manager covering for Pam that I would not be able to come to work on Monday, possibly Tuesday as well in order to be at a hearing. She said–"following corporate policy a subpoena doesn't remove your responsibility to find coverage for a shift." Corporate policy apparently requires you to find coverage or show up for the shift, unless calling out sick.

---

[9] I take judicial notice of the election date and results. *Rockwell Automation/Dodge*, 330 NLRB 547, 547 fn. 4 (2000) (Board takes administrative notice of the tally of ballots in related representation proceeding).

[10] Hagar is an admitted Section 2(11) supervisor. (Tr. 16–17; GC. 1(k))

[11] R-Case Transcript, at 547, 604.

Ybarra said they drafted the note as soon as they could, probably within an hour of the conversation, either during one of their breaks, or immediately after work.[12] According to Ybarra, they intended the note to accurately capture what Hagar said reflecting what Ybarra felt, at the time, were the important details of the conversation. (Tr. 67, 72–73, 135, 139; GC. 5)

In an effort to impeach Ybarra's testimony about Justin also being present, while questioning Ybarra, Respondent pointed to a statement in a February 2022 affidavit Ybarra provided during the underlying investigation where they said, "I mentioned what had happened to Justin . . . who was one of the other workers who was involved in the union organizing campaign." (Tr. 164). In response, Ybarra said the sentence in the affidavit was a result of them trying to over clarify that Justin had an understanding of what occurred because he was both present during the conversation with Hagar and that they also discussed what had happened again later.[13] The employee schedule for the day shows that both Ybarra and Justin were working together during the morning shift on January 14 when the conversation with Hagar occurred. (Tr. 159–164; R. 2)

Ybarra ultimately testified at the representation hearing on January 18. They were already scheduled to be off work that day, so there was no need for Ybarra to be excused from work. (Tr. 73–74, 112, 136)

### 2. Respondent's written policies

Ryan Lassiter, who works as a Starbucks district manager, testified that the only company policy regarding subpoenas is the one found in the Starbucks employee handbook, known as the partner guide. The relevant section of the Starbucks employee handbook/partner guide reads as follows:

> Jury and Witness Duty
>
> Serving on a jury is a fundamental responsibility of citizenship. If summoned to serve on a jury or if subpoenaed to testify as a witness, the partner should immediately provide the manager a copy of the summons or subpoena and make arrangements with the manager for the time away from work.
>
> Starbucks will pay the partner for any scheduled workdays or shifts missed as a result of jury or witness duty. The partner should contact the Partner Resources Support Center at (888) SBUX411 (728 9411) if selected to serve on a jury and the trial is anticipated to exceed the known work schedule. (R. 9, p. 55)

Employees receive a copy of the partner guide when they are first hired, and can also request another one if needed; the guide is also available electronically. Ybarra received a copy of the employee handbook when they were hired. (Tr. 122–123, 191, 309; R. 3)

Lassiter also testified as to his understanding of the subpoena policy in the partner guide saying, "you are to inform your next level supervisor to arrange coverage of your scheduled shift, and we would pay a . . . replacement for that time missed from work." (Tr. 310). Lassiter was asked by Respondent if an employee could be in violation of the company's policy even though they took time off to testify in a hearing, and he replied "yes." (Tr. 310) As an example, Lassiter referred to an incident when a barista was found to be a "no call/no show" for failing to show up for a scheduled shift without notifying anyone they would be absent from work. (Tr. 310–311)

Regarding the jury duty/subpoena policy, Starbucks manager Lawrence testified that the purpose of the policy is to outline how the company will accommodate any scheduled request for jury duty or a court subpoena, and that the policy allows "people to have an excused absence if they're summoned . . . for jury service or subpoenaed to testify in a legal proceeding." (Tr. 202). According to Lawrence, the policy's purpose is to ensure the company is able to continue to operate and still allow the employee to attend their scheduled court proceeding. Lawrence said that the policy advises an employee to inform their immediate manager as soon as they learn they have scheduled jury duty or receive a subpoena, with as much notice as possible so the company "can make arrangements to allow that space." (Tr. 202). Finally, Lawrence said that being absent because of jury duty or a subpoena is considered an excused absence so long as the company is given notice of the reason. (Tr. 202–203, 214)

### 3. Analysis

I found Ybarra to be a credible witness. Along with assessing their demeanor during the trial, and reviewing their testimony in light of the record evidence, I note that they were still employed by Starbucks at the time of the hearing, thereby testifying against their pecuniary interest. *Advocate South Suburban Hospital*, 346 NLRB 209, 209 fn. 1 (2006) enfd. 468 F.3d 1038, 1047 (7th Cir. 2006) (judge properly relied upon a number of factors in assessing credibility including the witness's demeanor and her status as a current employee testifying against her pecuniary interest). And Ybarra's testimony about what occurred during their conversation with Hagar on January 14 was unrebutted.[14]

Therefore, I credit Ybarra's testimony that, believing they needed to take the day off on January 17 to testify, and forgetting the day was a holiday, Ybarra spoke to Hagar during work on January 14. They were behind the counter near the ovens, and in the presence of Justin, who was also working that morning. Ybarra told Hagar that they had been subpoenaed to testify at the NLRB hearing, would not be able to come to work on Monday, possibly Tuesday, and wanted to make sure it was okay for them to be off work to attend the hearing. In reply, Hagar told Ybarra that her subpoena was not a protected reason to miss work and following corporate policy a subpoena did not remove Ybarra from the responsibility of finding coverage for her shift. Therefore, if Ybarra was absent from work they needed to find

---

[12] Ybarra's work schedule for January 14 shows that they were scheduled to take a break that day at 10:15 a.m., and their workday ended at noon. (R. 2)

[13] Justin no longer works for Starbucks. (Tr. 179). He did not testify in this matter.

[14] Hagar was not called as a witness and did not testify. While Respondent said that she no longer worked at Starbucks, the company did not subpoena Hagar and there is no evidence that Hagar was somehow not available to testify if she had been called as a witness by any party. (Tr. 99–100)

coverage for their shift to avoid discipline.[15]  Ybarra acknowledged what Hagar said about finding coverage for their shift, and the conversation ended.

   The Board has found that imposing potentially burdensome conditions on an employee as a prerequisite for attending a hearing pursuant to an NLRB subpoena constitutes a violation of Section 8(a)(4) and 8(a)(1) of the Act.  *Fitel/Lucent Technologies, Inc.*, 326 NLRB 46, 54–55 (1998).  In *Fitel/Lucent Technologies*, an employee named Joel Snyder had received a subpoena to testify at an NLRB hearing.[16]  Snyder was close to his limit on absences under the company's no fault absenteeism policy, so he spoke with Roddy Clifton, the vice president for human resources, asking how the company handled subpoenas, and inquiring as to whether missing work to testify would be counted against him.  Clifton replied saying that, if Snyder missed work to testify, his absence would be grounds for a write-up, as Snyder would have exceeded the company's policy limit regarding absences.  But, Snyder had the option of having someone work in his place or taking a vacation day to testify.  Because Snyder did not have any leave available, he found someone to cover his shift and was not penalized for being absent to testify at the hearing.  The Board found that the company's conduct towards Snyder constituted a violation of the Act, notwithstanding the fact the employer claimed that it was neutrally applying its no-fault absentee policy and trying to accommodate Snyder by suggesting how he could appear at the hearing without incurring an additional absence chargeable to his record.  *Fitel/Lucent Technologies*, 326 NLRB at 54.  Citing prior precedent, the Board found that "by imposing the potentially burdensome conditions that Clifton imposed on Snyder as prerequisite to his attending the hearing pursuant to Board subpoena, that he exchange shifts" with someone else, the employer violated Section 8(a)(4) and 8(a)(1) of the Act. Id. (citing *U.S. Precision Lens, Inc.,* 288 NLRB 505 fn. 3 (1988) and *Walt Disney World Co.*, 216 NLRB 836, 837–838 (1975)).  The Board noted that a violation was warranted "even though the impediments Clifton had created to Snyder's compliance with the subpoena had been put in place in neutral application of the Company's existing no-fault policy on absenteeism, had not necessarily intended to discourage him from participating in a Board hearing and had not resulted in disparate treatment." Id. at 55.  Once the company was informed that Snyder was under an NLRB subpoena, its obligation was to let Snyder "attend the hearing without imposing conditions."  Id.  The same analysis is applicable here.  Once Hagar was informed that Ybarra was under Board subpoena, her obligation was to let Ybarra attend the hearing without any preconditions.

   Respondent cannot argue that Hagar was simply applying the company's neutral attendance and/or subpoena policy, as the Board rejected a similar claim in *Fitel/Lucent Technologies*. Id.  See also *Walt Disney World Co.*, 216 NLRB 836, 837–838 (1975) (employer's attendance rules and policies cannot limit or restrict an individual's obligations to respond to a Board subpoena).  Also, the impediments imposed by Hagar did not constitute a neutral application of Respondent's policies.  As Lawrence testified, so long as an employee provides the company with notice for the reason behind the absence, Starbucks considers being absent from work because of a subpoena an excused absence.  This is exactly what Ybarra did; they notified Hagar about the subpoena as the reason behind their potential absence from work the next week.  While Respondent faults Ybarra for failing to notify the company about the subpoena and their potential testimony earlier than January 14, Starbucks did not rest its case in the representation hearing until that day.  It is therefore reasonable that Ybarra, who was the Union's last witness at the hearing, would have waited until they could give a reasonable estimate of when they were needed to testify before seeking guidance from company management.  Once Hagar learned that Ybarra was under Board subpoena, her obligation was to let Ybarra "attend the hearing without imposing conditions."  *Fitel/Lucent Technologies*, 326 NLRB at 54.

   Because the evidence shows that the preconditions set by Hagar were specifically counter to Respondent's policies, it could be inferred that Hagar may have been actually trying to discourage Ybarra from participating in the representation proceeding.  *Sunbelt Enterprises, Inc.*, 285 NLRB 1153, 1171 (1987) (departure from consistent past practice is evidence of discriminatory motive); *McClain & Co.*, 358 NLRB 1070, 1071 (2012) (employer's deviations from its handbook procedures is evidence of animus); *Hobgood v. Ill. Gaming Bd.*, 731 F.3d 635, 645 (7th Cir. 2013) (significant, unexplained, or systematic deviations from established policies or practices can be probative circumstantial evidence of unlawful intent).  That being said, because the Complaint only alleges a violation of Section 8(a)(1) of the Act, it is unnecessary to inquire into Hagar's actual motive for requiring Ybarra to find coverage for their shift to avoid being disciplined.  *Budrovich Contracting Co.*, 331 NLRB 1333, 1343 (2000) (motive is not an essential element of an 8(a)(1) violation).  Accordingly, by setting preconditions on Ybarra's ability to testify pursuant to a Board subpoena, requiring them to find coverage for their shift to avoid discipline, I find that Starbucks violated Section 8(a)(1) of the Act.  *Fitel/Lucent Technologies, Inc.*, 326 NLRB 46, 54–55 (1998);[17] *Winn-Dixie Stores, Inc.*, 128 NLRB 574, 578–579 (1960) (employer's statements to employees, attempting to persuade them to not honor Board subpoenas, a violation of Section 8(a)(1) of the Act).

### C. Complaint paragraphs 4(c) and 4(d)

Complaint paragraphs 4(c) and 4(d) allege that on or about

---

[15] I believe the fact that Ybarra's note ends by saying "Corporate policy apparently requires you to find coverage or show up for the shift, unless calling out sick" bolsters Ybarra's testimony that Hagar said they would be disciplined if they did not find coverage for their shift.  Hagar was trying to impress upon Ybarra that, unlike calling out sick, a subpoena was not an excused absence.  Therefore, if Ybarra did not find coverage for their shift, her unexcused absence would subject them to discipline.

[16] Facts taken from *Fitel/Lucent Technologies*, 326 NLRB at 51.

[17] In *Fitel/Lucent Technologies*, the Board found that the employer independently violated both Section 8(a)(1) and Section 8(a)(4) of the Act by imposing potentially burdensome conditions as prerequisites for employee attendance at a Board hearing pursuant to subpoena. 326 NLRB 46, fn. 3 (1998) (Board member Hurtgen noting his agreement that the respondent violated Section 8(a)(1) of the Act but not passing on the Board majority's finding that the conduct also violated Section 8(a)(4)).

January 27, Respondent: (1) counseled an employee for giving union buttons/pins to a customer who had expressed interest in them; and (2) instructed an employee to refrain from giving union buttons/pins to customers in the future while at work. Both of these allegations involve Ybarra handing out union buttons to individuals inside Store #304.

### 1. Ybarra gives out union buttons in the store

During the campaign to unionize Store #304, Ybarra kept a union button pinned to their apron; Starbucks employees wear a green store-clerk type apron while working. On January 26, Jennifer Popkin (Popkin), a regular customer who manages a comics and games store located two doors down the street, came into Store #304 for a cup of coffee. Ybarra was working and gave Popkin some union buttons. Popkin, Ybarra, and Mariscal testified about what occurred that day. Sometime later, Ybarra also gave a bag of union pins to a coworker inside the store. Mariscal and Ybarra testified about this incident. (Tr. 32–33, 75, 148, 158, 165, 171, 242–244, 173–175)

#### a. Popkin's testimony

According to Popkin, she was a regular customer at Store #304, coming in multiple times a week, and sometimes more than once a day. In January 2022, Popkin knew that the employees at Store #304 were trying to unionize, as it was common knowledge in the neighborhood. And, as a store regular, she also knew Ybarra. (Tr. 33–35, 39, 45–46)

Popkin testified that on January 26 she walked into Store #304 to get a coffee and had a conversation with Ybarra. Popkin was standing a few feet in front of one of the registers, while Ybarra was behind the counter. Popkin asked if Ybarra had any flyers or promotional stuff regarding the union drive that Popkin could put in her store. Ybarra replied saying that they had buttons. Popkin asked for some buttons saying she would take them back to her store and put them out for her employees. Ybarra then left the counter, walked to the back room, and returned with a small handful of union buttons which they gave to Popkin. Popkin estimated that it took Ybarra about 20 to 30 seconds to walk to the back room and return with the union buttons. The buttons were small campaign pins that said "Starbucks" along the top, and "Workers United" along the bottom, with a star separating each word. In the middle of the button is an image of a hand holding what appears to be a to-go coffee cup/bottle. (Tr. 36, 39–40, 47, 49, 51; GC. 2)

Popkin took the buttons back to her store, put them on a center console, and told her employees that the buttons were available for them to take. Popkin said there were no other customers in line at Store #304 when Ybarra gave her the buttons, and while there might have been customers waiting for a to-go order, she did not believe that there anyone else was in the store at the time other than herself and two or three other workers standing behind the counter in the barista area. According to Popkin, the incident occurred sometime in the early afternoon. (Tr. 38–40, 51)

#### b. Mariscal's testimony

Mariscal testified that she was working with Ybarra behind the counter in late January when Ybarra gave a union button to Popkin. Mariscal said she was standing about five or six feet away from Ybarra when she observed Ybarra leave the line, walk to the back room, come back, and give Popkin a button across the counter.[18] Mariscal thought that Popkin was waiting to pick up her mobile order at the time, but was not exactly sure. Mariscal did not believe that Ybarra said anything to their coworkers when they left to retrieve the buttons, nor did they ask anyone to cover their position. Mariscal could not remember Ybarra's specific job assignment at the time of the interaction, but said it was likely that they were working in the customer service position. Mariscal said that the incident happened in the morning, and there were five or six employees working behind the line. According to Mariscal, she did not hear what was said between Ybarra and Popkin because it was busy and pretty loud in the store. During the time it took for Ybarra to walk to the back room, return, and give the buttons to Popkin, Mariscal did not observe any customers that were left unattended, nor were there any customer complaints about what occurred. (Tr. 242–244, 269–271, 276, 290)

Mariscal said that she did not speak with Ybarra immediately after the incident, because she was unsure of the company's policy regarding the situation and said that she wanted to speak with her leader first. Mariscal testified that she only remembered having one discussion with Ybarra about passing out buttons, and that the conversation occurred after a second incident when Ybarra gave a bag of buttons to someone in the store while on their 10-minute break. (Tr. 244, 267, 279–280)

Regarding the second incident, Mariscal could not remember the exact date it occurred, but said it happened in January and that she believed it occurred within a couple of days after Ybarra gave the union buttons to Popkin, possibly even the next day. Mariscal testified that, on the day of the incident, she was standing close to the entrance when somebody Mariscal did not recognize walked into the store. This person did not approach the counter to order a drink or try to pick up a mobile order. Instead, the individual and Ybarra exchanged some type of hand signal; the person then sat in the corner. Shortly thereafter, Ybarra took their 10-minute break and Mariscal saw they walk to the back room, come back with a big bag of buttons, talk to the person in the lobby and give them the bag of buttons. All this happened while Ybarra was on their 10-minute break. Mariscal did not recognize the person who took the bag of buttons from Ybarra, and Ybarra never told her that the person was actually another Starbucks employee. (Tr. 245–246, 267–269, 279–280, 301)

As for her discussion with Ybarra, Mariscal testified that it occurred after she witnessed Ybarra hand the bag of buttons to the person in the store. Mariscal said that she pulled Ybarra aside, and they went to the back room; just the two of them were present. Mariscal characterized the interaction as "just a conversation" and denied raising her voice or using a harsh tone. (Tr. 246). According, to Mariscal, during the conversation she said that Ybarra could not be handing out things to customers, other than their food/beverage order, while on work time. Mariscal said that Ybarra could pass out buttons outside of the store or

---

[18] Throughout Mariscal's testimony the transcript reads union "pens" or "pen" instead of "pins" or "pin." The transcript is corrected accordingly. The transcript is also corrected to include Case Number 19–CA–289771 on the cover page.

work on their free time, and they could hand the buttons out to friends, family, whoever, but it was not appropriate to do this while on the floor and working while Ybarra is on the clock. When asked what words she specifically remembered telling Ybarra during this meeting, Mariscal testified that, during the meeting, Ybarra said that she was on a 10-minute break when they handed off the bag of buttons to the person in the store and Mariscal replied saying "that is still considered a company-paid time, so it is not something you should be doing while on the clock." (Tr. 249). After this January 2022 discussion, Mariscal said that she could not recall having any other conversations with Ybarra about distributing buttons in the workplace. (Tr. 244–249, 269)

In an effort to refresh Mariscal's recollection as to the exact date this conversation occurred, Respondent showed Mariscal a text message exchange between Mariscal and her district manager Johnna Turvin. The text message includes a photograph taken by Mariscal showing two Ziplock bags full of union buttons sitting on top of the small table that employees use in the back room; Ybarra's backpack is on the floor. Mariscal texted Turvin the picture with the statement "Rachel is passing these out to customers. Before I have a conversation. What do you think?" Turvin replied, tagging the picture with a double exclamation point, and writing "That doesn't feel right but let me check with nica and jim."[19] Mariscal responded with a thumbs-up emoji and said "Okay." Mariscal's phone showed that the message exchange with Turvin happened on January 26. (Tr. 138, 296–300, 305; R. 13)

Mariscal said that she sent the text message to Turvin because she felt what Ybarra was doing during work time was inappropriate, so she wanted to get some additional guidance as to whether she needed to have a conversation with Ybarra. According to Mariscal, she was not motivated in any way by the fact Ybarra was engaging in union activity at the time, nor was she responding to Ybarra's union activity. (Tr. 301–302)

### c. Ybarra's testimony

Ybarra testified that she was working on January 26 in a customer service/support position, which is also referred to as "CS." The CS position is considered floating support and is a mobile position. The barista in this role performs various tasks to assist their coworkers including brewing coffee, making pour-overs, cleaning, and restocking the line. According to Ybarra, Popkin came into the store that day and said that she liked the pin Ybarra was wearing. Ybarra replied by telling Popkin a friend of theirs made the pins, that they had some in their locker in the back room and offered to get some for Popkin. Popkin said yes, so Ybarra went to the back room, grabbed a handful of buttons from bags that she kept in their locker, and gave them to Popkin who said thank you. Ybarra said that her conversation with Popkin occurred at the register, while Popkin was placing an order, and that business in the store was slow at the time. Ybarra estimated that it took them no more than 30 to 45 seconds to walk to their locker, get the buttons, and give them to Popkin. Ybarra further said that Mariscal was working at the time and standing next to them when the incident occurred. Ybarra did not say anything to Mariscal or their coworkers that they were going to the backroom, explaining that they did not believe they needed to say anything because Mariscal was standing right next to her and saw what happened. According to Ybarra, Popkin usually comes into the store sometime in the late morning or afternoon. (Tr. 76–77, 142–150, 170, 321–329; GC. 3)

Ybarra said that the next day, when Mariscal came into work at around 8 a.m., she called Ybarra into the back room. Mariscal told Ybarra that they were not allowed to give out pins while they were at work on company time/work time and on Starbucks property. Ybarra said that Mariscal either said work time or company time; whichever it was, Ybarra understood Mariscal was saying that they could not hand out buttons to customers while on paid time—while at work on the clock. Ybarra perceived Mariscal's tone to be very harsh during this conversation and said that nobody else was present during the discussion except the two of them. (Tr. 78, 156–158)

During direct examination by the General Counsel, Ybarra did not testify about giving a bag of buttons to anyone. Instead, it was during questioning by Respondent on cross examination that Ybarra testified about the event, saying that, one day while she was on her ten minute break, she gave a bag of buttons to a Starbucks coworker. Ybarra said that the episode occurred sometime after she gave the union buttons to Popkin, and that Mariscal was present when it happened. Ybarra testified that, on the day in question, a Starbucks coworker from another location, who was organizing their own store, entered Store #304. Ybarra was on her ten minute break and gave the person a bag of buttons. Afterwards, Ybarra said that Mariscal followed her into the back room and when Ybarra went to sit down, Mariscal asked Ybarra why she had to have this conversation with her again. Ybarra asked what Mariscal was talking about saying that they were on their 10-minute break. In reply, Mariscal said that Ybarra was "still on company time." (Tr. 175) Ybarra never told Mariscal that the person they handed the buttons to was a Starbucks coworker. (Tr. 173–175)

On redirect examination by the General Counsel, when asked about the date of this incident, Ybarra said "I think it was late May . . . [l]ate May or early June." (Tr. 177) Ybarra further testified that the coworker who received the buttons was not someone who regularly came into Store #304 and the person had not previously worked at the store. Finally, Ybarra said that the bag of union buttons they gave their coworker were larger than the ones depicted in the photograph taken by Mariscal, and that the bag contained a variety of different types of pins. (Tr. 177–178, 330)

### d. Other items baristas have given to customers

In the past, baristas at Store #304 have given customers items that were not sold by Starbucks including brochures and stickers; they have also exchanged $2 bills with customers. Ybarra testified that there was an occasion in about March 2021 when baristas passed out some left-over Valentine's Day stickers to the daughter of a particular customer over the course of a couple

---

[19] Mariscal testified that "Nica" is a Starbucks regional director, and the record shows that "Jim" is legal counsel for the company. (305–306)

weeks. Some of the baristas also saved $2 bills they received as tips and would exchange the bills with a customer who collected them. Baristas also handed out resource booklets to customers who seemed to need help and were encouraged to do so by management. This material contained social services information listing places where people in need could go for food or a shower. (Tr. 79–82, 167–169)

Mariscal testified that she did not know employees were exchanging $2 bills with anyone. Regarding the resource booklets, Mariscal said that they were provided by outreach workers, pursuant to a company program, and contained information for the homeless community showing public resources that are available for people to receive food, water, and other items. As for passing out stickers, Mariscal acknowledged that one of the Store #304 employees brought in holiday themed stickers that were kept keep in a work area. Mariscal said they would place the stickers on cups to "spread holiday cheer." (Tr. 250). She denied seeing employees handing out stickers directly to customers. (Tr. 249–250, 302–304)

    e. Employee handbook rule on solicitation/distribution

Respondent's partner guide contains the following rule regarding solicitation/distribution:

Soliciting/Distributing Notices

Partners are prohibited from distributing or posting in any work areas any printed materials such as notices, posters or leaflets. Partners are further prohibited from soliciting other partners or non partners in stores or on company premises during working time or the working time of the partner being solicited. The only exception that may apply is when a partner is engaged in distribution or solicitation related to a Starbucks sponsored event or activity.

Persons not employed by Starbucks are at all times prohibited from selling, soliciting, distributing or posting written materials on company premises. If inappropriate solicitation occurs in a store by a non partner, a partner should politely ask the non partner to stop or leave the store.

As discussed earlier, the partner guide is distributed to all employees when they are hired and is also available electronically. (Tr. 122–123, 191; R. 5, R. 9, p. 36)

    2. Analysis

I believe that Popkin, Ybarra, and Mariscal were all trying to be truthful and testified as to the best of their recollection about what occurred regarding Ybarra handing out union pins. To the extent that their testimonies differed, I credit the testimony of Popkin, who was an unaffiliated neutral witness and whose credibility was not impeached. Accordingly, I find that on January 26 Popkin came into Store #304, as she regularly does, to get a coffee; it was sometime in the early afternoon. There were no customers in line, and virtually nobody else was in the store other than Popkin and a few workers standing behind the counter. Popkin knew about the organizing drive, and as she was standing in front of the register, she asked whether Ybarra had any flyers or promotional items regarding the union drive that Popkin could take back with her to put out in her store. Ybarra, who was standing behind the counter near one of the registers, said that they had some buttons. Popkin said she would take the buttons and leave them out for her employees. Ybarra then left the counter, went to the back room, and returned about 30 seconds later with small handful of union buttons which they gave to Popkin. Popkin took the buttons. When Popkin returned to her store she put the union pins out and told her employees they were available if anyone wanted to take one.

As for Ybarra giving a bag of union buttons to a coworker, there was a discrepancy between the testimony of Ybarra and Mariscal as to when the incident occurred and whether there were two conversations involving union buttons or only one. Otherwise, the testimony about what was actually said was similar. After a review of the record, I believe the evidence supports a finding that there was only one conversation, as testified by Mariscal, and that it occurred after the second incident, which happened during the last week of January 2022. Mariscal's testimony about the second incident was more detailed than the testimony of Ybarra, who testified about the matter in passing, only after it was raised by Respondent on cross-examination. Also, I believe that if the second incident had occurred in May, four months after the first incident with Popkin, and if it was the second time Mariscal had discussed this issue with Ybarra, there would have been some documentary evidence concerning the matter and showing that it happened in May. There was no such evidence. The only documentary evidence introduced by the parties about Ybarra passing out union buttons was the January 2022 text message exchange between Mariscal and Turvin. Accordingly, I believe the record supports a finding that, a few days after the incident with Popkin, during the last week of January 2022, Mariscal and Ybarra were working together when a Starbucks employee from another location entered Store #304. Ybarra knew the person was a coworker who was organizing their own store, but Mariscal did not know the individual was a Starbucks employee. The individual and Ybarra exchanged gestures or hand signals, and when Ybarra was on their 10-minute break they went to the back room, retrieved a bag of buttons, and gave the bag to their coworker who was standing in the lobby.

Mariscal saw what occurred and called Ybarra into the back room. Mariscal told Ybarra that they were not allowed to give out buttons/pins while they were at work on Starbucks property and on paid time, while they were on the clock, but that they could do this outside the store on their free time. Ybarra protested, saying that they were on their 10-minute break when the incident occurred. Mariscal replied by saying that their break time "is still considered a company-paid time, so it is not something you should be doing while on the clock."[20] (Tr. 249)

Restrictions against "employee solicitation and distribution of materials during non-work time and in non-work areas is presumptively invalid 'absent a showing by the employer that a ban is necessary to maintain plant discipline or production.'" *United*

---

[20] I credit Ybarra's testimony that they perceived Mariscal's tone to be harsh during their conversation. Having seen Ybarra pass out union pins twice, and after seeking guidance from her superiors, Mariscal wanted Ybarra's conduct to stop and she impressed this upon Ybarra after calling them into the back room for a one-on-one meeting.

*Servs. Auto. Ass'n v. NLRB*, 387 F.3d 908, 914 (2004) (quoting *Eastex, Inc. v. NLRB*, 437 U.S. 556, 571 (1978)). "In the case of retail marketing establishments, including public restaurants, however, the Board has held that solicitation and distribution may be prohibited on the selling floor at all times." *Beth Israel Hosp. v. NLRB*, 437 U.S. 483, 493 (1978). That being said, an employer cannot issue a blanket restriction prohibiting solicitation and/or distribution during an employee's paid break time. *Wireways, Inc.*, 309 NLRB 245, 245, 249 (1992) (because the employer did not repudiate its unlawful conduct, the Board finds respondent violated Section 8(a)(1) by prohibiting distribution on company paid break-time). *Valmont Industries, Inc. v. NLRB*, 244 F.3d 454, 469 (5th Cir. 2001) ("An employer must permit solicitation during meals, breaks, and other nonworking time, even if the employee remains 'clocked in' during such times.").

Here, Mariscal's statement to Ybarra that they could not pass out buttons/pins during their company paid breaks is presumptively invalid. Starbucks offered no evidence of special business circumstances that would justify such a prohibition.[21] And, Respondent cannot point to its employee handbook to forego a violation. Mariscal never referenced the partner guide in her discussion with Ybarra and the partner guide does not define break time or working time. Therefore, it does not negate Mariscal's unlawful definition of employee working time which, according to Mariscal, includes paid breaks. Accordingly, by instructing Ybarra that they could not pass out union buttons and pins during her company paid break-time, Respondent violated Section 8(a)(1) of the Act.

### CONCLUSIONS OF LAW

1. The Respondent is an employer engaged in commerce within the meaning of Section 2(2), (6), and (7) of the Act.

2. Workers United, affiliated with the Service Employees International Union, is a labor organization within the meaning of Section 2(5) of the Act.

3. By informing employees that they cannot testify pursuant to an NLRB subpoena without first securing covering for their shift, Respondent violated Section 8(a)(1) of the Act.

4. By threatening employees with discipline if they testify pursuant to an NLRB subpoena without having securing covering for their shift, Respondent violated Section 8(a)(1) of the Act.

5. By prohibiting all union solicitation or distribution during company paid break periods, Respondent has violated Section 8(a)(1) of the Act.

6. The above unfair labor practices affect commerce within the meaning of Section 2(6) and (7) of the Act.

### REMEDY

Having found that the Respondent has engaged in certain unfair labor practices, I shall order it to cease and desist therefrom and to take certain affirmative actions, as further set forth in the Order below, designed to effectuate the policies of the Act. The Respondent shall be required to post the attached notice in English in accordance with *J. Picini Flooring*, 356 NLRB 11 (2010) and *Durham School Services*, 360 NLRB 694 (2014).

In the Complaint, the General Counsel seeks a notice reading as an additional remedy. A notice-reading is a special remedy generally imposed where the violations are particularly numerous and egregious, where the respondent is a recidivist violator, or where other compelling circumstances exist. *Amerinox Processing, Inc.*, 371 NLRB No. 105, slip op. at 2 (2022) (notice-reading remedy appropriate where violations are numerous and serous); *Holiday Inn Express Sacramento*, 366 NLRB No. 118, slip op. at 1 (2018) (the need for a notice reading found to be "particularly compelling" to counteract the employer's "flagrant disregard" of an earlier notice reading which signaled the company had no intention to adhere to the law). In its brief, the General Counsel's argument supporting its request for a notice reading remedy is limited to a footnote, and relies upon the allegations in Complaint paragraphs 4(a) and 4(b) regarding Ybarra's subpoena to testify in the NLRB representation proceeding. (GC. Br. at 18) However, I do not believe that the unfair practice violations found in this matter warrant a notice-reading remedy. I note that, in *Fitel/Lucent Technologies*, 326, NLRB 46, 55–56 (1998), where a similar violation occurred, the Board did not order a notice-reading remedy. The same is true in *U.S. Precision Lens, Inc.*, 288 NLRB 505 (1988), *Walt Disney World Co.*, 216 NLRB 836 (1975) and *Winn-Dixie Stores, Inc.*, 128 NLRB 574 (1960). Because the General Counsel has not shown that the Board's standard remedies are insufficient to remedy the unfair labor practices found herein, I find that a notice-reading remedy is not necessary.

On these findings of fact and conclusions of law, and on the entire record, I issue the following recommended[22]

### ORDER

Respondent Starbucks Corporation, its officers, agents, successors, and assigns, shall:

1. Cease and desist from

(a) Informing employees that they cannot testify pursuant to an NLRB subpoena without first securing coverage for their shift.

(b) Threatening employees with discipline if they testify pursuant to an NLRB subpoena without having secured coverage for their shift.

(c) Prohibiting all union solicitation or distribution during company paid break periods.

(d) In any like or related manner interfering with, restraining, or coercing employees in the exercise of the rights guaranteed them by Section 7 of the Act.

2. Take the following affirmative action necessary to effectuate the policies of the Act

(a) Within 14 days after service by the Region, post at its Store #304, located at 101 Broadway East, Seattle, Washington,

---

[21] Because Mariscal's statement prohibited all solicitation/distribution on behalf of the union during company paid breaks, there is no need to determine whether Starbucks qualifies as a public restaurant or whether the lobby area in Store #304 is a considered a sales area. In fact, these issues were not briefed by any of the parties.

[22] If no exceptions are filed as provided by Sec. 102.46 of the Board's Rules and Regulations, the findings, conclusions, and recommended Order shall, as provided in Sec. 102.48 of the Rules, be adopted by the Board and all objections to them shall be deemed waived for all purposes.

copies of the attached notice marked "Appendix."[23] Copies of the notice, on forms provided by the Regional Director for Region 19, after being signed by the Respondent's authorized representative, shall be posted by the Respondent and maintained for 60 consecutive days in conspicuous places, including all places where notices to employees are customarily posted. In addition to physical posting of paper notices, notices shall be distributed electronically, such as by email, text message,[24] posting on an intranet or an internet site, and/or other electronic means,[25] if the Respondent customarily communicates with its employees by such means. Reasonable steps shall be taken by the Respondent to ensure that the notices are not altered, defaced, or covered by any other material. If the Respondent has gone out of business or closed the facility involved in these proceedings, the Respondent shall duplicate and mail, at its own expense, a copy of the notice to all current employees and former employees employed by the Respondent at Store #304 at any time since January 14, 2022.

(b) Within 21 days after service by the Region, file with the Regional Director for Region 19 a sworn certification of a responsible official on a form provided by the Region attesting to the steps that the Respondent has taken to comply.

APPENDIX

NOTICE TO EMPLOYEES
POSTED BY ORDER OF THE
NATIONAL LABOR RELATIONS BOARD
An Agency of the United States Government

The National Labor Relations Board has found that we violated Federal labor law and has ordered us to post and obey this notice.

FEDERAL LAW GIVES YOU THE RIGHT TO

Form, join, or assist a union

Choose representatives to bargain with us on your behalf

Act together with other employees for your benefit and protection

Choose not to engage in any of these protected activities.

WE WILL NOT inform employees that they cannot testify pursuant to an NLRB subpoena without first securing coverage for their shift.

WE WILL NOT threaten employees with discipline if they testify pursuant to an NLRB subpoena without having secured coverage for their shift.

WE WILL NOT prohibit all union solicitation or distribution during company paid break periods.

WE WILL NOT in any like or related manner interfere with, restrain, or coerce you in the exercise of the rights listed above.

STARBUCKS CORPORATION

The Administrative Law Judge's decision can be found at www.nlrb.gov/case/19-CA-289275 or by using the QR code below. Alternatively, you can obtain a copy of the decision from the Executive Secretary, National Labor Relations Board, 1015 Half Street, S.E., Washington, D.C. 20570, or by calling (202) 273-1940.



---

[23] If the facilities involved in these proceedings are open and staffed by a substantial complement of employees, the notice must be posted within 14 days after service by the Region. If the facilities involved in these proceedings are closed or not staffed by a substantial complement of employees due to the Coronavirus Disease 2019 (COVID-19) pandemic, the notice must be posted within 14 days after the facilities reopen and a substantial complement of employees have returned to work. If, while closed or not staffed by a substantial complement of employees due to the pandemic, the Respondent is communicating with its employees by electronic means, the notice must also be posted by such electronic means within 14 days after service by the Region. If the notice to be physically posted was posted electronically more than 60 days before physical posting of the notice, the notice shall state at the bottom that "This notice is the same notice previously [sent or posted] electronically on [date]." If this Order is enforced by a judgment of a United States court of appeals, the words in the notice reading "Posted by Order of the National Labor Relations Board" shall read "Posted Pursuant to a Judgment of the United States Court of Appeals Enforcing an Order of the National Labor Relations Board."

[24] See R-Case transcript at 208, 276, 281, 624–626 (noting that the manager for Store #304 communicates with employees by email and text message).

[25] The representation proceeding transcript shows that the manager and employees at Store #304 use a Facebook group for purposes of securing coverage for available shifts. See R-Case transcript at 101, 208–210, 571–573, 577–578, 580–581, 622.